## LAURA E. PRATHER v. ELMER E. HAIRGROVE et al., Appellants.

### Division Two, July 25, 1908.

1. **NEGOTIABLE NOTE: Payment or Purchase?** The payment by a stranger of a negotiable note, already indorsed by the original payee "without recourse," may operate at the time as a purchase, although not so understood at the time by the holder. Whether or not it is a purchase or payment depends on the party paying. So where a note was given to Truitt as payee, and he indorsed it "without recourse" and delivered it to Field, and afterwards Hairgrove, who did not know Field was the holder, applied to Truitt to purchase it, and was informed by Truitt that he could buy it if he would do so that day, and he told him he would and went to Truitt's office and presented a check for the amout, and Truitt took the check to Field and obtained the note, before it was due, and Field said nothing about releasing the deed of trust or marking the note paid, and thereafter Truitt delivered the note to Hairgrove, who was not its maker, but a stranger, all the evidence is one way that the transaction was a purchase and not a payment.

2. **CONSPIRACY: Deed to Husband and Wife: Sale: Deed of Trust.** Property had been deeded to plaintiff and her husband subject to an existing valid deed of trust, which they assumed, and they agreed to pay the note secured thereby. Afterwards she secured a divorce and a judgment for alimony against him, and during the pendency of that suit he conveyed the lot to his attorney in payment for his services, and the attorney thereafter purchased the note secured by the deed of trust, with his own money, and at the sale under the deed of trust bought in the lot at a small amount in excess of the debt and costs and for about its actual value, and obtained the money with which he did so from another and gave a deed of trust upon the lot to secure the payment to such other of the money loaned to him. *Held,* that, however fraudulent may have been the intention of the husband in conveying the lot to his attorney to defeat the wife's judgment for alimony, it was, as all the evidence shows, made for a valuable consideration, and as the evidence clearly shows that the attorney bought the note secured by the subsisting deed of trust, with his money, borrowed from his brother, and afterwards paid him with money borrowed from third per-

Prather v. Hairgrove.

sons, as to whom there is no suspicion of improper conduct, and secured them by a deed of trust, the title passed to the attorney on the foreclosure of the first deed of trust, and the deed from the husband to the attorney and the subsequent deed of trust cannot be made a junior lien to the wife's judgment for alimony.

Appeal from Jackson Circuit Court.—*Hon. W. B. Teasdale*, Judge.

REVERSED (*with directions*).

*Willis H. Leavitt, S. C. Price* and *Hairgrove & Stubbs* for appellants.

(1)   The presumptions of law are in favor of honesty and fair dealing, and when fraud is alleged, it must be proved by evidence clear and cogent, which overcomes these presumptions; and if the transaction comports as well with honesty and fair  dealing,  it should be referred to that motive.   Bernecker v. Miller, 44 Mo. 102; Garesche v. MacDonald, 103 Mo. 1; Ridge v. Greenwell, 53 Mo. App. 479; Gordon v. Ismay, 55 Mo. App. 323; Robinson v. Dryden, 118 Mo. 354; Wcbb v. Darby, 94 Mo. 621; Henderson v. Henderson, 55 Mo. 537. (2) The law presumes, prima-facie, that the holder of a negotiable promissory note is the owner of it and that he took it for value in the regular course of business; and the holder of such note, by the fact of having it in his possession, has authority, prima-facie, to collect it.   Grelle v. Loxen, 7 Mo. App. 97; Shirts v. Overjohn, 60 Mo. 308; Bank v. Friar, 88 Mo. App. 43; Boek v. Nuella, 28 Mo. 180; Davis v. Carson, 69 Mo. 609; Speers v. Bond, 77 Mo. 467; Wilson v. Smith, 52 Mo. App. 135.   (3) A trustees's deed under a deed of trust with power of sale establishes, prima-facie, default in the payment of the secured debt.   R. S. 1899, sec. 4371; Morrison v. Herrington, 120 Mo. 674; Hume v. Hopkins, 140 Mo. 65.   (4)   When the holder of a note is paid the amount of it by one not primarily liable by contract for its payment and delivers the note to the party so paying, the transaction

is a purchase of the note and not an extinguishment of the debt, unless the latter is the intention of the party making the payment.    Thompson v. Longan, 42 Mo. App. 146; Swope v. Leffingwell, 72 Mo. 348; Campbell v. Allen, 38 Mo. App. 27; Allen v. Dermott, 80 Mo. 56; 7 Cyc. 1025.    (5)  The payment of a note works an extinguishment and satisfaction of the obligation only when the person who makes such payment is primarily bound by contract to pay it, and then only as to those to whom he is bound.    Allen v. Dermott, 80 Mo. 59; 7 Cyc. 1020, 1021, 1024.    (6)  Estates by the entirety exist in Missouri as at common law, with power in the husband to dispose of the entirety and vest title thereto in his grantee, which title can be defeated only by the wife's survival of the husband. Wilson v. Frost, 186 Mo. 319; Garner v. Jones, 52 Mo. 71; Hall v. Stephens, 65 Mo. 678; Russell v. Russell, 122 Mo. 236; Bains v. Bullock, 129 Mo. 120; Harrison v. McReynolds, 183 Mo. 539; Mueller v. Kaessmann, 84 Mo. 324; 21 Cyc. 1200; Tiedman on Real Property (Enlarged Ed.), sec. 242.

*A. S. Marley* for respondent.

(1)    The question of purchase is a question of intention, and the holder of a note must have notice of the purchaser's intention to buy.    Kyne v. Erskine, 7 Mo. App. 591; Wolff v. Walter, 56 Mo. App. 294; Thompson v. Longan, 42 Mo. App. 153.    (2) There could be no legal transfer of the title without the assent of E. B. Field.    Wolff v. Walter, 56 Mo. 294; Thompson v. Longan, 42 Mo. App. 153; Dunn v. Railroad, 45 Mo. App. 36.    (3)  The demand of a creditor which is paid with the money of a third person without any agreement that the security shall be assigned or kept on foot for such person, is absolutely extinguished.    Bunn v. Lindsay, 95 Mo. 259; Brown v. Bank, 66 Mo. App. 427; Lemmon v. Lincoln. 68

Mo. App. 80; Grady v. O'Reilly, 116 Mo. 356; Klein-
man v. Gieselman, 114 Mo. 444; Price v. Courtney, 87
Mo. 395.    (4). The Hicks note being paid, the lien
upon the property became extinguished immediately
upon the payment and could not again be revived ex-
cept by making new deed of trust.    Murphy v. Simp-
son, 42 Mo. App. 658; Merrill v. Chase, 3 Allen 339.
(5)  The fact that defendant may have been mistaken
as to what the legal effects attendant upon his actions
and the actions of his co-defendant were, does not en-
title him to any relief, for mere mistake of law does
not relieve from the legal effect of their acts.    Norton
v. Highleyman, 88 Mo. 624.    (6)  The conveyance
to Prather and wife created an estate in entirety sub-
ject to the encumbrance, then a lien upon the property.
Neither can affect the legal estate to the prejudice
of the other.    Gibson v. Zimmerman, 12 Mo. 386;
Shwyer v. Nichell, 55 Mo. 268; Hall v. Stephens, 65
Mo. 681.    (7)  The husband alone cannot by his con-
veyance without joining his wife divest the estate of
the wife.    Gibson v. Zimmerman, 12 Mo. 386.    (8)
They are each owner of the whole but not of the half.
Gibson v. Zimmerman, 12 Mo. 388; Garner v. Jones,
52 Mo. 71.    (9)  The part subject to sale under exe-
cution against the husband is his marital right, that
which he holds by virtue of the marriage only, i. e.,
the possession and usufruct of his wife's real estate
during marriage, not by virtue of the deed of convey-
ance.    Hall v. Stephens, 65 Mo. 679; Bains v. Bul-
lock, 129 Mo. 119; Arnold v. Willis, 128 Mo. 151;
Russell v. Russell, 122 Mo. 238.    (10)  At time of
judgment of alimony, Mrs. Prather was entitled to
the possession of the entire estate against every per-
son except her husband.    Bains v. Bullock, 129 Mo.
120.    (11)  As against the foreclosure proceedings,
which casts a cloud upon her estate in entirety, she can
214 Sup.—10

maintain the suit, for it affects not only the rights "to possession and usufruct," but divests her entire estate.   Bains v. Bullock, 129 Mo. 120; Arnold v. Willis, 128 Mo. 150.   (12)   Laura Prather can attack the pretended trustee's sale for two reasons:   (a)   As a judgment creditor of Charles E. Prather, having a specific judgment lien against the property involved to the extent of his interest that she may subject it to sale under execution.   Foll v. Soper, 75 Mo. 462; Bank v. Chambers, 96 Mo. 467; Lionberger v. Bank, 88 Mo. 455.   In Lionberger v. Bank the court commends this as the better method.   (b)   As the owner in the entirety of the legal estate, to remove a cloud upon her title to the estate in entirety. Mason v. Black, 87 Mo. 344; Harrington v. Utterback, 57 Mo. 519; Gardner v. Terry, 99 Mo. 526; Sneather v. Sneather, 104 Mo. 206.   (13)   The demand being in judgment, we have a right to assail the attempts to convey as a fraud upon the right of a judgment creditor.   Crum v. Walker, 79 Mo. 335; Thias v. Simer, 103 Mo. 323.

GANTT, J.—This is an appeal from a decree rendered by the   circuit court of Jackson county, Missouri, in favor of the plaintiff against the defendants in a suit in equity, the object and purpose of which was to obtain a decree that a certain indebtedness represented by a note of $750, executed by Susie Hicks and E. Hicks, her husband, to E. S. Truitt, and secured by a deed of trust executed by them to W. E. Garrett as trustee, conveying the west half of lot 20, Saighman Place, an addition to Kansas City, Missouri, had been paid and satisfied, and to set aside and decree as null and void a certain trustee's deed made by the said Garrett as trustee on August 1, 1903, for the purpose of foreclosing said deed of trust and satisfying said note; and also to set aside a certain quitclaim deed made by defendant Charles Prather to El-

mer E. Hairgrove of date August 1, 1903, and filed of record in Jackson county, and also a certain deed of trust executed by the said Elmer Hairgrove to the defendant W. R. Lemley as trustee to secure an alleged indebtedness to Bertha J. Dockson in the sum of $770; that all of said conveyances be adjudged null and void and canceled.

The defendant Hairgrove for his separate answer denied all of the allegations of the petition except those hereinafter specifically admitted in his answer. He admits that the plaintiff Mrs. Laura E. Prather and Charles E. Prather were at the time of the filing of the petition herein, husband and wife, and that prior to August 1, 1903, the record title to the property known and described as the west half of lot 20, Saighman Place, Kansas City, was in the said Charles E. and Laura E. Prather, and that at the time of the filing of the petition herein there was an action of divorce pending in the circuit court of Jackson county, Missouri, wherein Charles E. Prather was the plaintiff and said Laura E. Prather was defendant, and that said court made an order on Charles E. Prather for the payment of $150 alimony *pendente lite,* and that at the time this suit was brought, the said amount had not been paid. Said defendant further admits that on August 1, 1903, Charles E. Prather made, executed and delivered to defendant a quit-claim deed to the aforesaid described real estate and the same was on said date duly recorded. Defendant further represented to the court that the said property was at and prior to the date of purchase thereof by said Charles E. Prather encumbered by a deed of trust in the sum of $750 and the said deed of trust was a bona-fide and existing encumbrance on said property therein described; that on the 24th day of September, 1900, said Charles E. and Laura Prather acquired the same by warranty deed; that by the terms of the con-

tract of purchase, it was agreed that the said Charles and Laura Prather acquired said property subject to the said deed of trust then existing and unpaid and assumed and agreed to pay said note and deed of trust as a part of the consideration and purchase price of said property. Said defendant Hairgrove further alleges that neither the said Charles E. Prather nor Laura E. Prather nor the makers of said note ever paid said note, nor has anyone for them paid said note as alleged in plaintiff's petition. Defendant then further alleges that said note becoming due and payable and not having been paid upon demand of the legal holder of said note, the trustee, Garrett, in accordance with the terms and conditions of said deed of trust, caused the said property to be advertised for sale, and did on August 1, 1903, sell the same at auction for cash to satisfy said debt and the said defendant Elmer E. Hairgrove was the highest and best bidder for the same. And thereupon the trustee, on the said last-mentioned date, made, executed and delivered to said defendant Hairgrove a trustee's deed to said property, and by virtue of said deed said defendant is now and has been since August 1, 1903, the legal owner thereof.

The defendant Charles Prather admits that he was the husband of the plaintiff at the time alleged by plaintiff; that he was a joint owner of the property with her, and that he conveyed the same by quit-claim deed to his co-defendant, Elmer E. Hairgrove. He denies that he ever paid off the note or the deed of trust on said property and alleges that the deed of himself to said Hairgrove was a bona-fide deed for good and sufficient consideration. He denies all manner of unlawful combination and confederacy wherewith he is charged in the petition and prays to be dismissed.

On the 6th day of June, 1900, Mrs. Susie Hicks and her husband E. Hicks, executed and delivered to

E. S. Truitt a note for $750, due three years after date, with interest thereon at the rate of six per cent per annum, and on the same  day executed and delivered a deed of trust in the usual form to W. E. Garrett as trustee for E. S. Truitt, conveying the west half of lot 20 in Saighman Place, an addition to Kansas City. This note was by E. S. Truitt indorsed ''without recourse,'' and sold to the Mills heirs, Mrs. Dorothy Mills guardian, for whom E. B. Field was the trusted agent in purchasing and handling such paper and collecting the interest thereon.    On the 24th day of September, 1900, Charles E. Prather and Laura E. Prather, who were then husband and wife, acquired said lot by deed from Joseph Lorie subject to the said encumbrance of $750, and as a part of the purchase price assumed and agreed to pay said indebtedness of $750. The evidence tends to show that Charles E. Prather paid the interest from to time through the firm of Truitt & Co., except the last three semi-annual installments of interest, which were paid by Prather to E. B. Field.    It appears that when Prather paid the semi-annual interest due on the note in December, 1902, he asked Field what would be the prospect of renewing the note when it fell due in June, 1903, and was told by Field that in the next six months he ought to be able to save $75 or $100 and he, Field, would renew the balance for three years for ten dollars.    Prather then told him he might be in a position to pay the note off. In March, 1903, Charles E. Prather filed suit for divorce against his wife Laura, which was returnable to the April term, 1903, of the circuit court of Jackson county.    The defendant E. E. Hairgrove was his attorney in bringing the suit.    On the 18th of April, 1903, at the April term of said court, the  court allowed Laura E. Prather $150 for alimony *pendente lite*. Mrs. Prather filed a cross-bill in said action for divorce and on October 16, 1903, at the October term,

1903, the court dismissed Prather's petition for a divorce, because he had not complied with the order of court to pay the $150 alimony.    Afterwards on October 31, 1903, Mrs. Prather was granted a divorce on her cross-bill and was given the custody of her children and a judgment for $250 alimony and $16 per month from December 1, 1903, for seven years.    In the meantime the transactions out of which this suit originated occurred.

On the part of the plaintiff, E. B. Field testified that he held this note for $750 as the agent of Dorothy Mills, the guardian of the Mills heirs.    He testified that on or about the 13th of May, 1903, a Mr. Stewart, a representative of E. S. Truitt & Co., a real estate firm, came to his office and said to him that Prather wanted to pay the Hicks note, and was told by Field that if Prather wanted to pay it off he would have to pay the interest up to June the 6th.    Stewart then said, "You get the note and I will try and see what he says;" that he would take the note to Prather and see if he would pay the interest to June 6th, and if he did not, he, Stewart, would bring the note back. Thereupon Mr. Field allowed him to take the note and after having been gone some thirty or forty minutes Stewart returned and handed Field a check for $772.50, the amount of the   principal and interest due on the note at its maturity, June 6, 1903.

On the part of the defendant, F. W. Stewart testified that he was engaged in the real estate business in the employmnt of the firm of E. S. Truitt & Co., that he knew Mr. Field and defendant Hairgrove and Prather.    He testified this loan of $750 was made through the office of E. S. Truitt & Co., who sold the note to Mr. Field for the guardian of the Mills heirs. That before the note became due Prather asked witness if Truitt & Co. could extend it and witness took the matter up with Mr. Field, who said he would extend

it and Truitt & Co. agreed to extend it for ten or fifteen dollars. Witness thereupon told Prather of this and the latter said he would let him know. A short time after this, he came into the office one day and Mr. Truitt told him to call up Mr. Hairgrove; he called him up about this note and Hairgrove said he wanted to get the note. After that he went and got the note from Mr. Field and Hairgrove came down and paid him the money for it in cash and he delivered him the note and deed of trust and an insurance policy. Witness stated that he did not think that he ever told Hairgrove who was the owner of the note. Witness was not the agent of Hairgrove, but represented E. S. Truitt & Co. in the transaction. When witness went to Mr. Field, he asked him what it would take to take up the note, and he said $750 and six months' interest. Asked if he told Field that he wanted to pay the note, he answered that he did not remember what he said to Field about it, further than he told him he wanted to take the note and Hairgrove was going to get it from us. "I do not recollect of telling Mr. Field that Mr. Prather wanted to pay the note." He could not recollect the exact conversation between himself and Field. Prather was not present when he turned the note over to Hairgrove and received the money for it. He remembered that Hairgrove paid him the money.

Defendant Hairgrove testified in regard to this matter. He stated that he had been practicing law since the year 1884 and in Kansas City since the 29th of October, 1900; that shortly after he became acquainted with Prather, the latter employed him as an attorney to commence a divorce proceeding; pending that proceeding, he had negotiations with Mr. Mastin, Mrs. Prather's attorney, looking to the settlement of the property rights of the parties, and while the suit was still pending he learned that this note and deed

of trust was about to become due.    Defendant Prather was owing witness quite a considerable amount as attorney fees.    He had a brother who wanted to invest in good securities of this city, and he went to Mr. E. S. Truitt, whom he had heard was the owner of this note, on the 11th of May, 1903.    He was not personally acquainted with Mr. Truitt at that time, and he got defendant Prather to go with him and introduce him to Mr. Truitt.    He at once broached the subject of purchasing the note and deed of trust and asked Truitt if he had that note.    "I asked him if he would sell the  note and he  said he would, that he would sell anything that he owned, but if he sold the note to me he would sell it without recourse.    I told him I had a client that would purchase it, but did not give him the name of the client.    Truitt said he was very busy at the present time and said he would call me up later.    On the following morning Truitt called me over the telephone and asked if I was the party who came to see him in regard to the purchase of the note the day before, and I told him I was and he said:    'Well if you want to buy that note you can get it if you will get it today.' "    Witness procured the money from Mr. W. L. Lemley, part of it, and a part was what he had of his own money at that time, and went to Truitt's office and met Mr. Stewart, whom he knew and had had business with him as an employee of Truitt.    Stewart said, "Did you conclude to buy that note?" and witness answered, "That is what I came here for."    Stewart then went into another room and brought the note and trustee's deed, also an insurance policy.    Witness examined the note and Stewart called his attention to the fact that it was endorsed in blank without recourse.    Witness asked what was the amount that was due and Stewart said $772.50, whereupon witness said, "There is not that amount due, I would be paying a premium on it, and

I do not like to do that. 'Well,' he says, 'the insurance policy runs until in August and we'll just let one clear up the other.' He asked if I was buying it myself, and I told him no, I was buying it for my brother.'' Up to that time he had no conversation with Stewart about the note, his talk had been with Mr. Truitt. Witness then sent the note and deed of trust to his brother J. N. Hairgrove, Virden, Illinois, and his brother sent him a draft for the same, which was turned over to Mr. Lemley in payment of the money he had borrowed from him to purchase the note. He had given Lemley a note at the time he got the money payable on demand. Later on when the note fell due he called up Truitt and asked who the trustee was in this deed of trust and Truitt said that the trustee had an office in the building, and asked, ''What do you want to see him about?'' and he told him that he wanted to have the deed of trust foreclosed, and Truitt said, ''Go ahead and foreclose, it will be all right with Garrett.'' He then proceeded to advertise the sale, but an error was made in the advertisement in spelling Garrett's name ''Garritt'' instead of Garrett, and on the day of the sale, Garrett refused to make the sale, thereupon he served notice to readvertise and the sale was set for August 1, 1903. At the sale there was one bid made by a party and then witness made two bids; his first bid was $800, he then raised his bid on a computation as to what the cost would be; the reason he did this was that not exceeding four days before the sale Mr. Field called him up over the telephone and asked him if he was representing the party that was foreclosing the Hicks note on the Saighman property, and he told him that he was. Mr. Field inquired at what hour the sale would take place and he told him he would like to have it at ten o'clock, and asked Mr. Field who he was interested in, and Field said he was interested in or rather representing

Mr. and Mrs. Hicks, and "we do not want the property to sell for less than the encumbrance and cost," whereupon witness told him, "I will see that it brings that amount, because the property is worth more than that." He then asked Field if he cared to go higher, and he said he had no interest in it other than to see Mr. and Mrs. Hicks represented. He testified that Mr. Prather had nothing to do with furnishing any part of the money that purchased the note. He testified further that he had no agreement with Prather by which he was to procure the title or any interest in it and held it for Prather's benefit; there was not now and never had been any such agreement. In regard to the Dockson note, the deed of trust in which Lemley was the trustee, he said that about one or two days before the first of August, 1903, he went to see Mrs. Dockson and told her that he was thinking of making a bid upon some property, and what the property was, and wanted to know if she would loan him some money temporarily to buy it, and she said she would, and on the morning of August 1st, she brought one thousand dollars to his office in cash and delivered it to him, and this deed of trust was given to her to secure that loan. That he only used $770 of the $1,000 and the balance of the bid was his own individual money. He testified that he was not aware at any time previous to the purchase of the Hicks note that Mr. Field had anything at all to do with it; he never knew Mr. Field in the transaction in any way until he called him up. In regard to the quit-claim deed of the defendant Prather to himself for the lot, he stated it was given to him to protect him as to his attorney fees due him from Prather, in the event the property sold for more than the encumbrance. He testified positively he never told him that it was his (Field's) understanding that the Hicks note had been paid either at the time Field testified he did or at any

other time.    On the contrary, Field testified that after he discovered the property was advertised the second time, he had a conversation with defendant, E. E. Hairgrove, and asked him why he had advertised this property when the note had been paid off.    Hairgrove said, it had never been paid, but Field answered by saying:    "I got my money and paid it up to the 6th of June."    Hairgrove then said:    "I advertised because the taxes are not paid," to which Field answered, "The taxes are due the 13th of May, but really not due until August some time, city taxes."    Field also emphatically testified that nothing was said to him about selling the note to anybody.

The value of the Saighman lot was shown to be from $1,050 to $1,350.

W. R. Lemley testified that he loaned the defendant E. E. Hairgrove the money to purchase the Hicks note, and it was afterwards refunded to him in a draft from J. N. Hairgrove; that he was made trustee in the Dockson deed of trust without his knowledge.

This is about the substance of all the testimony. The circuit court by its decree adjudged that the transaction between Hairgrove, Truitt, Stewart and Field constituted a payment of the note secured by the deed of trust executed by Susie and E. Hicks and at first decreed that the sale by Garrett as trustee to Hairgrove was null and void and also a quit-claim deed from Charles Prather to Hairgrove, but afterwards on a motion for new trial, the court upon further consideration struck out so much of the decree as annulled and held void the quit-claim from Prather to Hairgrove and the deed of trust from Hairgrove to secure the Dockson note, and in lieu thereof adjudged and decreed that said quit-claim deed to Hairgrove and said deed of trust by Hairgrove in favor of Mrs. Dockson were subsequent liens to the lien of the judgment for alimony and costs in the divorce case.

I.  The plaintiff's contention is that the transaction between Field on the one hand and Prather, Hairgrove and Stewart on the other, constituted a payment of the note known as the Hicks note and discharged the lien of the deed of trust.    Whereas the defendant insists that the evidence clearly shows that the Hicks note secured by the deed of trust on the property in controversy was purchased by J. N. Hairgrove through his brother E. E. Hairgrove, and that the debt was not paid by his acquisition of it.    Of course, if the debt was extinguished by that transaction then the sale under the deed of trust was unauthorized and null and void and Hairgrove took no title by the trustee's deed.    There is no pretense that the plaintiff, Mrs. Prather, in the case, paid the Hicks note, or any part of it, nor is there any evidence that her former husband Prather paid said note or any part of it.    Prather testified that he did not pay the note and did not arrange with anybody to pay it for him, and that he furnished no money with which to pay off the note.    At the time of the alleged payment or the date when Field received the amount of the note and interest for the Mills heirs, the note was not yet due. E. S. Truitt was the original payee in this note, he had transferred it to the Mills heirs without recourse on himself and the note was being held for Dorothy Mills by her agent, Mr. Field.   While Field testified that Stewart spoke to him in regard to the note and said that Prather wanted to pay it off, the evidence of Stewart and Hairgrove and Lemley leaves, we think, no doubt whatever that Hairgrove borrowed the money from Lemley with which to purchase the note, and that Hairgrove made his proposition to obtain this note by purchase from Truitt, and that he up to that time supposed that Truitt, who was the payee in the note, was still the owner of the note and Truitt proposed to sell it to him, and there is little

if any room for doubt that Stewart was carrying out Truitt's instructions in acquiring the note from Field. It is not pretended by Field that prior to the time he received the amount of the note and interest from Stewart he had ever spoken to Hairgrove, or that Hairgrove had any knowledge whatever that Field had the note instead of Truitt. That Truitt and Stewart's purpose was to effectuate a purchase of this note from Field for Hairgrove, we think there is no doubt whatever. Stewart could not recall the exact language he used to Mr. Field when he spoke to him and made the arrangement to reacquire the note for Truitt, but it is not strange that a transaction of that kind would not have made such an impression upon him as to cause him to remember. the exact words that he used.

When Field delivered the note to Stewart, the original indorsement by Truitt was on the back of the note unerased and the note thus indorsed by Truitt, the original payee, was delivered by Stewart, the agent of Truitt, to Hairgrove. The only evidence to support the claim of the plaintiff that this transaction worked the payment of the note and the extinguishment of the debt which it evidenced is the testimony of Field that when Stewart came to him to get this note Stewart said that Prather wanted to pay it off, and that when he turned over the note to Stewart he did not say anything about selling. Stewart testifies that he has no recollection of saying to Field that Prather wanted to pay it off. And Prather testifies that he did not pay it off and made no arrangement with anybody to pay it off for him, and furnished no money with which to pay it. The learned counsel for the plaintiff insists that Wolff v. Walter, 56 Mo. 292, is decisive of this contention that this transaction was a payment and not a transfer of the note and bases his insistence upon the language of Judge Adams in that case, to the effect that, "There could be no legal transfer of the note,

without the assent of the holder. The bank only had the authority to receive payment, and not to sell or transfer the note." It is to be noted that the difference between that case and this is that the note had been deposited by the payee in the bank for collection and the bank had no authority to transfer the note, but only to receive payment. Whereas in this case all the testimony tended to show that Mr. Field, as the general agent of Mrs. Mills, had full authority to dispose of this note in any manner he saw fit. The reading of that case will show that the great preponderance of the evidence was that the note was simply left with the bank for collection and that Wolff, the plaintiff, went with the payor, L. H. Walter, to the bank on the day of the maturity of the note and said they wanted to pay the note, and the teller received the amount in payment of the note and erased the payee's name, which had been indorsed on the back of the note, and this court said that the weight of the evidence was in favor of the finding of the circuit court, of which there can be no doubt whatever; neither do we doubt the proposition that there could be no transfer of the note without the assent of the holder, but that case in no manner discusses what would amount to evidence of the assent of the holder. In Allen v. Dermott, 80 Mo. l. c. 59, it was said by this court: "It is only when a person is primarily bound by contract to pay a note that his payment of it works an extinguishment and satisfaction of the obligation, and then only as to those to whom he is bound." This statement of the rule does not conflict with the other well-recognized principle of law, that if a volunteer or stranger pays the debt of another without his request, he acquires no rights as against the debtor thereby.

In Thompson v. Longan, 42 Mo. App. 153, Judge GILL, in discussing the identical proposition advanced by the plaintiff herein, said: "In the matter of the

purchase and the transfer of this note and attendant
mortgage, plaintiff's counsel contends rightly that, like
other contracts, there must be a consensus of minds of
indorser and indorsee.  There could be no legal trans-
fer of the note without the assent of the holder. [Wolff
v. Walter, 56 Mo. 292.]  There appears here one 'phys-
ical fact' at least, which argues very strongly in favor
of this assent by the holder to O'Day's purchase of
the note.  I refer to the written indorsement of Both-
well, transferring the note in express terms.  Mrs.
Schmidt, it is true, did not, in person, pen this trans-
fer, yet Russell, her agent, did, and the same was by
him sent to St. Louis preparatory to securing the
money thereon.  The note thus indorsed by the ap-
parent holder and owner was notice of itself to O'Day
that the owner had agreed to sell and transfer the
same to whomsoever should pay the amount called for.
It is said in Neuhoff v. O'Reilly, 93 Mo. 164, that
'where the true owner of a negotiable note, overdue,
clothes another with the usual evidence of ownership
or with full power of disposition, and third persons are
thereby led into dealing with such apparent owner and
receive a transfer of the same, they will be protected.'
As to O'Day's intention of becoming a purchaser of
the note, the evidence is all one way.  He never intend-
ed a payment of the note and mortgage, but simply to
take up and carry the encumbrance for the temporary
relief of an embarrassed friend.  This being his inten-
tion, the duty of the court is to give effect to such in-
tention.  [Campbell v. Allen, 38 Mo. App. 27.]''

Now applying the law announced in that case to
this, it is clear that Field clothed Stewart or Truitt,
for whom Stewart worked, with the evidence of owner-
ship of this note.  The note was indorsed by Truitt,
the original payee, and Hairgrove applied to Truitt to
purchase the same.  As said in Thompson v. Longan,
supra, as to Hairgrove's intention to purchase the note,

the evidence is all one way.  He had applied to Truitt to know if he could buy it and was assured by Truitt that he would sell it to him if he would purchase it that day, and thereupon he borrowed the money from Lemley and went at once to Truitt's office and the note was produced to him and he paid his money for it. It needed no transfer in writing by Field under these circumstances to pass the title of the note to Hairgrove, and while Field says that no one said anything to him about selling it, he turned it over for the check and did not mark it paid, nor suggest the satisfaction of the deed of trust.  In fact it seems to have been a matter of utter indifference what became of this note, so that he could get the full amount of the principal and interest thereon for it.

In Swope v. Leffingwell, 72 Mo. 348, the question of purchase or payment was the point for decision, and this court said:  "The authorities are all to the effect that 'if money be paid, not by one who is a party to a judgment and liable upon it, but by some third person, the judgment will be extinguished or not according to the intention of the party paying.' "  In that case this court quoted with approval from Harbeck v. Vanderbilt, 20 N. Y. 397.  In that case GRAY, Judge, said: "Every judgment purchased and paid for is, so far as the plaintiffs in it are concerned, paid; but if at the time of payment an assignment is made by the plaintiffs to a third party for the benefit of one with whose money or credit the payment is made, the judgment, although in one sense paid, is not satisfied, but remains subsisting and valid, until it has answered the purposes for which it was assigned."  And SELDEN, Judge, in a concurring opinion, says:  "It is equally clear that if the money be paid, not by one who is a party to the judgment and liable upon it, but by some third person, the judgment will be extinguished or not, according to the intention of the party pay-

ing." In Lyon v. Maxwell, 18 L. T. Rep. (N. S.) 28, the court of exchequer held that the payment of a bill by a stranger may operate as a purchase although not so understood at the time by the holder, who supposed it to be made on behalf of the acceptor, and the purchaser was allowed to maintain his action against the maker. This last-cited case is applicable here because in that case the third party purchased a bill of exchange and in this case Hairgrove purchased the negotiable promissory note before maturity.

In Campbell v. Allen, 38 Mo. App. 1. c. 30, it was said: "The question is, did the transaction amount to a payment, or was it a purchase of the note? There can be no doubt as to Mrs. Price's *intention* in the matter. She purposed becoming the owner of the note. She intended a purchase of the instrument, not its payment. It is true that the bank officer, holding for collection for Mr. Black, refused to pen an assignment on the note, and that Mrs. Price took the same without such indorsement. Yet she paid the $112, and the note and the deed of trust were given into her possession, with a distinct understanding, as the evidence shows, that she was then the owner, and she was then the owner to every intent and purpose. It did not require an indorsement in writing to invest her with the ownership of the property. Mrs. Pollie Price was not a party to the note, was under no legal obligation to pay it. This being so, and it being the clear intention, from the inception of the transaction, that she should use her own money, as she did, to purchase, and not to pay off and discharge the debt, the law will heed such intention and enforce the rights to the property." As already said, as to Hairgrove's intention to purchase and not to pay the note, there is absolutely no doubt in the case. On the other hand, it is equally clear that Truitt did not regard

this transaction as a payment of the note. Hairgrove had applied to him to buy it and he had offered to sell it to him, and when Hairgrove appeared at his office, Truitt had the note in his possession indorsed by himself with nothing upon it to indicate any ownership by Field or the Mills heirs or any other person. Hairgrove was no party to the note, was under no legal obligation to pay it and it would be in the face of all business experience to hold that Truitt or Hairgrove either considered the purchase of this note by Hairgrove as a payment of it, simply because Field testifies that he did not intend to sell it and that Stewart told him that Prather wanted to pay it off. All the evidence shows that Stewart was the employee of Truitt and went to Field from Truitt because Truitt had told Hairgrove he would sell him the note and the latter had come to purchase it. A payment by Prather was not in the contemplation of any of these parties at the time. Moreover, after Field had parted with this note and Hairgrove had purchased it and paid for it and the land had been advertised for sale, Field called up Hairgrove to know what day and hour the sale would take place and was informed and was asked by Hairgrove what interest he had in it, and he said nothing further than to protect Mr. and Mrs. Hicks, and Hairgrove thereupon agreed to make the lot bring the amount of the interest and costs, and he did so. This conduct of Field is out of harmony with his other testimony in which he claims that he told Hairgrove the note had been paid, which Hairgrove denied. In view of all of the evidence in the case, we are of the opinion that the transaction by which defendant Hairgrove acquired this note was a purchase of the note and not a payment of it.

II. But it is insisted that the record discloses a conspiracy to deprive the plaintiff of her interest in

the lot in question and of her right to subject the interest of her former husband, Charles E. Prather, to the payment of alimony awarded her by the court. In the first draft of the decree in this case, the learned circuit judge decreed that the quit-claim deed from Prather to E. E. Hairgrove and the deed of trust from the latter to Lemley as trustee for Mrs. Dockson, were null and void, but upon reconsideration at the same term the learned judge struck out that portion of the decree and in lieu thereof simply adjudged that said quit-claim deed and deed of trust should be subsequent liens on said lot to the judgment for alimony and costs adjudged against Charles E. Prather prior to July 31, 1903. In plaintiff's petition this deed and deed of trust were alleged to be fraudulent and for that reason void, and such was the finding of the court in the first instance, but in the amended decree, there is no finding or intimation that the deeds were fraudulent but simply subsequent liens. The circuit court having refused to sustain the charge of fraud so as to invalidate these two conveyances and render them null and void, the plaintiff not having appealed therefrom, it would seem unnecessary to devote much space to the discussion of the charge of fraud further than the finding and decree that said two conveyances should be held subsequent liens to the plaintiff's judgment for alimony. It is obvious, we think, that the charge of fraud is predicated upon the conduct of the defendant Charles E. Prather, and his efforts to deprive the plaintiff of any interest in the lot, but back of all of his conduct, which resulted in a decree of divorce in favor of plaintiff, stands the fact that when Prather and plaintiff obtained this lot, they took it subject to the lien of the first deed of trust in favor of Truitt to secure the Hicks note, and not only that but they agreed to pay the same as a part of the consideration for their interest in the lot. There is no

pretense that there was any fraud to impeach this first note. Obviously, if plaintiff can get rid of that note and the title acquired thereunder by E. E. Hairgrove, it was and is essential to show that Hairgrove either purchased this lot at the trustee's sale with the money of Charles E. Prather, or had entered into an agreement with Prather fraudulently to acquire the same in his own name and hold it for the benefit of Prather. However reprehensible the conduct of Prather may have been, the whole testimony shows that he not only did not furnish Hairgrove money with which to buy this lot, but the whole burden of the testimony shows that Prather was not able to buy and had no means with which to raise the money to pay for the same. The question then is, what evidence was there that Hairgrove was guilty of a fraud in buying this first lien? He was the attorney of Charles E. Prather in the divorce case and Prather was indebted to him for fees for his services to him in that case, and it may be added that he had a right to purchase the note and incidently the equity, over and above the said first lien, to secure his fees for his services. Bearing the relation of attorney to Prather his purchase of the deed of trust and the lot may be and is open to the closest scrutiny, but when this is done, it clearly appears from the testimony of Lemley, as to whom, we take it, there is no ground of suspicion whatever of any suspicious or improper conduct, that he furnished E. E. Hairgrove with the money with which he purchased the note. The evidence as to Stewart's complicity in the matter amounts to no more than that Stewart, as an employee of Truitt, represented Truitt in procuring the note from Field and paying the latter the full amount of the note and interest. Stewart was in no sense the agent or representative of Hairgrove, but represented Truitt in the transaction. Whatever the motive of E. E. Hairgrove in purchasing this note and

subsequently the land at the trustee's sale, we take it there can be no doubt whatever that he had a perfect legal right to do so with his own money and in the absence of an agreement with Charles E. Prather to purchase it for him, he was not a trustee for Prather, nor is he chargeable with Prather's assertions of his own intention to deprive his wife of an interest in the land. Having the right to purchase the note for his brother, J. N. Hairgrove, we do not see that the plaintiff is interested in the way he procured the funds from other disinterested parties to make the purchase. The plaintiff seeks equity in this case and yet in the face of the plainest equity she seeks to have this property turned over to her entirely released from the deed of trust, which was the first lien thereon, and which she had bound herself to pay before she could obtain a clear title thereto. We think it would be against the plainest principles of equity to permit her to avail herself of the money paid by Hairgrove for the purchase of this first lien without having ever paid one cent to satisfy it. It may be and probably is true that her husband was guilty of improper conduct towards her, and had the purpose, as far as he was concerned, to defeat her judgment for alimony and deprive her of her interest in the lot, but it seems from the evidence that for want of means he was utterly powerless to carry out his designs to that end. In view of the evidence in the case we are satisfied the learned circuit court judge properly concluded that there was not sufficient evidence of fraud to justify him in annulling and setting aside the deed of Prather to his interest in the lot to the defendant E. E. Hairgrove, and the deed of trust given by the latter to secure the loan from Mrs. Dockson. The most that can be said of it is that at first blush a suspicion is aroused because the transaction of E. E. Hairgrove involved his brother and other relatives in raising the money to buy the note and pur-

chase the land, but if he had the right to buy the note, as we think he clearly did, he also had the right to go to his own relatives and friends to raise the money with which to make the purchase. But when it appears unmistakable that Prather did not furnish the money, or a dollar of it, but that Hairgrove did, we are utterly unable to see upon what ground the plaintiff could have the first lien, the Hicks note, which neither she nor her husband had paid, declared satisfied, and the property turned over to her discharged therefrom. Unlike the case of Wolff v. Walter, 56 Mo. 292, in which it was pointed out by this court that the debt was not a debt to Mrs. Walter, and that she as a married woman at that time, could not bind herself personally therefor, at the time this property was acquired by the plaintiff and her husband, plaintiff had a perfect legal capacity to contract and bind herself and this property was deeded to her and her husband whereby they acquired an estate by the entirety therein and she agreed and bound herself to pay off this first lien of the Hicks note, and it stood confessed that she had never paid a cent thereon, and the whole evidence satisfies us that her husband had never paid any thereon. Under such circumstances to deprive J. N. Hairgrove of the benefits of his purchase of that note and the defendant E. E. Hairgrove of his rights acquired by the sale of the property to satisfy that note would be in our opinion inequitable and unjust. Neither do we see any ground upon which the circuit court could adjudge the deed of trust given by the defendant E. E. Hairgrove to Mrs. Dockson a subsequent lien to plaintiff's judgment for alimony. By the sale of the lot under the Hicks deed of trust all the right, title and interests of both Charles E. Prather and the plaintiff herein were wiped out and there was no surplus left over which could have been applied to the payment of said alimony; that this was unfortunate for plain-

tiff may be and is freely conceded, but the only way to have avoided it was to have made the land bring enough to pay the said alimony, but this was not done. The lot was variously estimated from $1,000 to $1,500 in value and brought at the trustee's sale $832.33, so that there is no evidence of inadequacy of price in the case. It results that the judgment and decree of the circuit court should be and is reversed with directions to the circuit court to dismiss the bill.

*Fox, P. J.,* and *Burgess, J.,* concur.